Our fourth case for this morning is Aaron Isby against Richard Brown, 15-3334. So, Mr. Bhabha? May it please the Court, Ishan Bhabha for Appellant Aaron Isby. I'd like to reserve three minutes for rebuttal. Less than 48 hours ago, the State filed a motion to dismiss this appeal, and we responded to that in writing yesterday. While, of course, we're happy to address any questions the Court might have about that motion, if not, I'd like to move straight to the merits of Mr. Isby's due process and Eighth Amendment claims. My only question about that motion is what you think your best evidence is that he is in some imminent danger of physical injury as required to get over the three strikes and you're out rule. Your Honor, Mr. Isby did not plead in his complaint or inform the District Court that he was in imminent threat of physical injury. However, I would say two things to that. Firstly, for the reasons that we argued in our brief, we believe that this is a discretionary decision the Court can make, and it could determine, in light of Federal Rule of Appellate Procedure 3, that the appropriate remedy here would be, for example, for counselors we have offered and are able to pay Mr. Isby's filing fee to the Court and to the District Court as well. And although that doesn't totally remedy Mr. Isby's failure to inform the District Court, and we concede that, we do believe that this is a discretionary decision. The State had every reason to know of this and could have brought it up since 2012 when this case was initiated. Mr. Isby is raising very serious due process and Eighth Amendment challenges to his over decade long solitary confinement. And given those facts, Your Honor, we believe it appropriate for the Court to exercise its discretion and reach the merits of this case. And we did cite one case in our briefing of yesterday, Garcia in the Tenth Circuit, where the Court did reach the merits of an already briefed appeal despite the presence of a 1915 G ban. Okay, so let me tell you one of my thoughts about your fundamental due process argument. I think I'm more interested right now in talking about that than the Eighth Amendment. He has these 30 day reviews, and you've argued, I think quite persuasively, that they're very perfunctory and the like. But it seems to me unfair to the record to say that that's the only process that he's getting. Because at least since 2014, now shockingly more than two years ago, they've also been coming to him and offering him, in a sense, more process. They've been saying, if you go through these programs, we'll transfer you to New Castle, or your chances will be much better. They've been offering him all sorts of additional opportunities, and he spurns all of them. So I think it's a little myopic to say that the only thing he's getting is the 30 day reviews. Your Honor, it is true that the state argues in its brief, and there was evidence introduced at trial, that Mr. Isby was offered a number of programs, the MRT and the ACT. However, the state has never- And also the New Castle process. And also the transfer to the New Castle facility. However, the state has never argued that any one of those programs would lead to his being released from solitary confinement. The standard that they apply is a multi-factor, discretionary one. And if you look at page six of the state's brief, they note that there are individuals who have been released from solitary confinement without participating in the programs, and individuals who have participated who haven't. Sure. No, I understand. That's true, especially for the ACT and the MRT. But the New Castle, I mean, it's a different place. It's not the special confinement unit. I don't know what the conditions are like at New Castle, but one would assume maybe not quite so dire as they are in the special confinement unit. Your Honor, there wasn't testimony introduced at trial as to the conditions at the New Castle unit, though I'll note that the state hasn't argued, though it may inform the court now, that a transfer to New Castle would actually be a release from solitary confinement. Judge Magnus Sensen made clear that she found that there were openings to his cooperation that would have resulted in his being released, and she did that based on testimony by government officials at trial. So, I mean, whatever there may be in terms of general due process for people generally, she's already found, and I don't know what basis we would find otherwise, that those were openings for your client. Well, certainly, Your Honor, they were programs that were offered to him. I agree with that. But it isn't just the offering. She found that that's the reason why he is still where he is. Your Honor, with respect, I don't think the state is arguing that simply if Mr. Isby had participated in those programs, he would definitely be released. Indiana policy is multifactored. But, again, the state hasn't even said this to Mr. Isby in any one official communication over 10 years. But how could the state flatly commit to move him before he starts either the ACT or the MRT or whatever other kind of program, not knowing how it's going to go? I mean, he's got a history of not being interested in cooperating with a lot of things, but they might be saying, well, you know, if he successfully completes them, a big if, then he is in good shape. And they do seem to be worried about the increasing duration of his time in solitary. And, you know, I certainly take your point that that's a pretty awful way to live your life. But he's making it so hard for them to move him. Your Honor, I don't think the state has to commit to releasing him guaranteed if he finishes these programs or if he begins the programs. But what I do think due process requires is in the communications it makes to Mr. Isby to give him some explanation for his continued confinement. Why isn't the explanation you're not doing these programs? Well, Your Honor, that is the explanation that has come out through litigation. In the statements made to Isby over a decade, it is two boilerplate statements, your status has not recommended to be changed and it will not change. But that's not true. On the record, he was regularly being told by the people who were working with him that he needed to pass these programs to show he has some control. If you're saying that it's a violation of due process because that wasn't put in writing, is that necessary where we know factually what he was told? Well, Your Honor, the anecdotal statements that were made to him by case workers or people he interviewed with were different than the actual review proceeding that the prison itself puts in place to evaluate individuals in long-term solitary confinement. And when a prison puts such a proceeding in place, I think even informal due process makes it incumbent upon the prison that they explain to an inmate, even in a brief manner, as to why he is being held there. Was he present at those hearings, the two 90-day hearings that were held? Your Honor, it's not in the record, though my understanding of the 90-day hearings is that he would not necessarily have to be present at the hearing. He wouldn't have to be, but was he? My understanding, it's not in the record. Understood. So I think that the reason the state has to give more than two statements, and now in litigation this case has been pending since 2012, if it takes an inmate to bring a civil rights suit in order to get an explanation through trial testimony, I don't think that's even what the Indiana procedure provides for. What the state is required to do is to give Mr. Isby some explanation because otherwise there really is no boundary on the state's decision-making process and no evidence that it is engaging in reasoned decision-making. Mr. Bauer, if the state regularly just inserted the sentence, you're not cooperating with our proposed programs or you're not, but it's the same sentence all the time. In other words, it's not in great detail. Would you think that was sufficient? Your Honor, I think it would be a different case. I think then the state would at least be in a position to plausibly argue that they've given Mr. Isby some guide for future behavior and that they are showing their own reasoning. And in CUMA, which is a case out of the Fourth Circuit we cited, and Toes v. Rees, which is in the Tenth Circuit, both cases noted the importance of not simply having perfunctory boilerplate notifications because it really does give no evidence that the state is engaging in any reasoned decision-making. So that's where I want to get back to my original question. If I agree with you, which I think I do, that the statements in the 30-day reviews are boilerplate, perfunctory, non-illuminating, can't really tell how much new evidence they're taking into account, et cetera, I'm having trouble understanding why the federal Constitution requires the state to incorporate everything it knows in these 30-day statements if it's providing some flow of information to him in other ways as well. I mean, it sounds like we're elevating form over substance in that sense. Your Honor, I think the reason for that is twofold. I think, firstly, anecdotal information that is told to Mr. Isby that comes out through a federal civil rights trial is not, I think, what due process requires to inform an inmate about what the conditions of confinement he's suffering are and why he is suffering them. I think that the state would not need to give Mr. Isby an extensive, multi-page, detailed, footnoted analysis of why he's in solitary confinement. But I think the cases that we cited in our brief do stand for the proposition that while certainly the prison has discretion, maybe significant discretion, to determine where inmates need to be placed in order to comply with security regulations in the prison,  So if within a prison someone is given 90 days for being involved in a fight with another inmate, 90 days of segregation, every 30 days they have to hold and issue a formal explanation for why they're not releasing that person early? No, Your Honor, for two reasons. Firstly, under the Indiana proceedings, the 30-day reviews need not be a formal review. And if Mr. Isby, to be clear, if the record was clear that Mr. Isby had received 90-day reviews, this would be a different case. We don't have the evidence as to whether or not those 90-day reviews satisfied due process, but the District Court found that since 2011, there is a disputed issue of material fact as to whether Mr. Isby has had any opportunity to argue to the prison that he should no longer be in solitary. So that's one point, Your Honor. Well, he had two 90-day hearings, right? The evidence is that up until 2011, there were at least two. He claims he has requested since and has not received them. I thought you said since 1990, but that's fine. That's correct. So there were two, and there's at least some evidence. I don't know that the District Court found that he requested two others, and he claimed he requested 11. That's correct. But there's no documentation of those others. There's some evidence that there were two more requests. Correct. The District Court found there was a disputed issue of material fact on whether the subsequent requests had been made and whether they'd been fulfilled. So you're agreeing that if they had a 90-day hearing and it wasn't completely pro forma, that that would satisfy due process? Well, Your Honor, there isn't evidence in the record as to the content of the 90-day hearing because the District Court found it unnecessary. So I can't represent to the court that I think that does comply with due process, but I think it's a different scenario. But the second thing I want to say – Well, what's the minimum you think is required for due process? Your Honor, I think the minimum that is required for an inmate who, like Mr. Gisby, has been held in solitary confinement for now over a decade. Is it because it's indefinite or because it's a certain amount of time? While you're answering that question, I want to know what the flow of time does to the due process requirement. Is it one thing if it's three months or six months and then more due process once it's dragged on to four years and even more due process once it's ten years, or is it a constant? Your Honor, I think that the Matthews v. Eldridge test looks at the liberty interest at stake for an individual and the risks of erroneous deprivation. And I think under that legal framework, when an individual has been held for a very prolonged period of time, the liberty deprivation he is suffering is greater. And I think in Mr. Gisby's case, the risk that he is being held today for something that occurred 17 years ago is very acute. Whereas, for example, in a case like Hewitt, which the government cites from the Supreme Court, there the inmate was moved six days after inciting a violent prison riot. And I think there, obviously, when you look at the situation, it would be absolutely elevating form over substance to say, well, you were adjudicated to have done a prison riot. Nonetheless, we need a full dress hearing as to whether you can be moved to solitary. Here, the evidence which was introduced at trial was that Mr. Gisby was initially moved to solitary in 2006 based on an incident that happened in 1990. You can see that if you look at pages 48 of the trial transcript, which is Mr. Snyder testifying that there were no incidents for Mr. Gisby in the 19 days he was in the general population, and also page 324. But he'd had a pretty awful record between 1991 and 1999, 17 major infractions, five serious batteries, and then three more for the next eight years. In other words, it wasn't like he did one bad thing in 1990 and was a model inmate up until 2006. No, Your Honor. I think that is a correct reading of the factual record. But I would also note that from 2009 to December 2014, five years, Mr. Gisby had no disciplinary incidents. And yet the same boilerplate 30-day statements were revealed by the prison. We think at a minimum what we would ask this court to do is to reverse the district court's grant of summary judgment and remand this case for trial on whether the 90-day reviews have taken place. And if so, Mr. Gisby would then be free to make any arguments regarding due process. Okay. Why don't you save what you can for rebuttal then? I will do that, Your Honor. Mr. Kraft. Good morning, Your Honors. May it please the court, I'm Aaron Kraft. I represent the defendant prison officials in this matter. Assuming that the court does not dismiss the appeal based on our motion to dismiss, we ask that you affirm the district court's judgment for three reasons. First, the 30-day reviews of Gisby's placement comply with the teachings of Hewitt, Shettle, and this court's decision at Westifer. So let's stop right there because those 30-day reviews trouble me quite a bit because the factual circumstances, as Mr. Baba just said, are quite different when somebody is in a very extended, let's just say greater than a year, a very extended period in something like the special confinement unit. And the notion, two things bother me about it. One is the ambiguity about one's ability to introduce additional information into the calculus because, of course, as time goes by, behavior may be good, it may be bad, but it seems to me it's highly relevant. And the lack of any opportunity for the prisoner to have some kind of input, and I'm not saying they have to be sitting there in the room, but some kind of input. Submit a statement, talk to the hearing officer, anything. And so I was troubled by the district court's assumption that these 30-day quick looks were the end of the discussion. Well, Your Honor, I think viewing them as just quick looks by a detached hearing officer is the incorrect way to look at them. The people conducting the reviews, especially two of them, Mr. Snyder, the unit team manager, and then Ms. Gilmore, the casework manager, are interacting with Bisbee on a continual basis. Mr. Bisbee does not have a formal hearing that he comes to appear at, but he is giving his input through his actions through those 30 days. But he's not told, as the Tenth Circuit was talking about, if you want to get out of the special confinement unit, there's a path. This is what it is, and it's on you now. You have to decide to do this. He's never told that until this litigation is underway, which is a, I mean, I hate the thought that the state won't do anything until there's a lawsuit against it, which makes it a little suspect in my view anyhow. So this, you know, we're not letting you out now, but here's the path. And an interaction, that's what I don't see in these 30-day proceedings. Well, Your Honor, I think the Department of Corrections' position is the administrative segregation policy itself says the offenders who are placed there are placed there because they're a safety risk. They're a danger to others. And as Smith v. Shuttle Forever? For 17 years? Until they do something to prove that they are no longer a danger. But that's like a mysterious, it reminds me of the castle. You know, Franz Kafka's very famous book. If what he has to do is a secret, then how is he going to know to do it? I don't see how it's a secret to say, or for the offender to know, this is how I got here. I know why I got here. I need to change, so I get out. Does it mean that he's got to stop speaking rudely to people? Does it mean that when he sticks his hand through the little slot for food trays, he can't wave it around, not like he's going to hit anybody when he's behind the door? Does it mean he has to do the ACT or the MRT program? Is there any passing score that he knows he has to earn in order to move to the next layer down of security? He doesn't know any of that. Right. Part of the problem is that this is not a purely objective inquiry. This is not like a Wolf situation where this is all about objective fact-finding, what happened in the past. But you surely are not arguing that it can be just capriciously decided by the Department of Correction people, oh, we've just decided to leave Isby in the SCU for the rest of his life. No. We don't like the guy. He's annoying, so that's where he's going to stay. No, that's not what we're suggesting, and I would point out that the state really does not want people in the long-term segregation. The state has incentive to move these people out. This is a very resource-intense operation. It's very stressful for the guards. There are a lot of resources put in to making sure that the offender's constitutional rights are adhered to, that the MRT, the ACT programs are provided. But it's also stressful for the inmates, and I guess I have to wonder how a person, any person, particularly in the literature, kept for 10 years in an 8-by-10 or whatever it is cell, 80-square-foot cell, so he's rude and uncooperative. It seems to me that it's not surprising that somebody has behavior issues when they don't have any human contact. Or at least that they're not going to get any better under those circumstances and likely to get worse. Well, that's what the programs are there for. But what do you do with someone who's not willing to do the programs, which clearly this fellow is not? Is that enough to just say that they remain in isolation? I think some of the Supreme Court decisions may suggest that is enough, but I'm more concerned about what our obligation is when we're supposed to ensure meaningful procedural review, and we don't know what procedural review is occurring. I can't tell from this record, and I'm not sure that Judge Magna Stinson was able to tell, other than she accepted the proposition that every 30 days there's a review. But what's our obligation? And after U.S. v. Wilkerson, I think the answer is it's a heightened obligation. It's a magnified obligation when someone is in isolation for an indefinite period of time. So what in this record lets us decide, yes, there is meaningful procedural review occurring? Well, I think the makeup of the review team and the fact that they're the people who interact with us on a daily basis. I think the 90-day reviews and as we've- But we don't know what's happening. The record was deliberately left undeveloped on that point because the district court judge thought that the 30-day reviews made that a non-material fact. But if we were to disagree with her, I just don't see how you can bring the 90-day process in at all. I guess it- Well, we really don't know. Even if you brought it in, we don't really know what that entails either. There are only two of them, and we don't have any record of what they involved. It does involve an interview with Mr. Isby. And this, again, it's not- Is that in the regs, or where do we know that? It's not in the regs. I thought it was in the record. But there were only two of those over 10 years. Well, there were two in 2011. There's no evidence preceding 2010 because of the limitations period. And there's no evidence since the summary judgment was granted in 2013. So there were two since 2011. There's no report. There's nothing we can look at to say these were the conclusions. Not in the record. Well, not in the record because you won on summary judgment or because there just isn't- there isn't such a report. I mean, if there were a prison regulation or something, I presume you would be free to cite that to us if there were such a thing. Did they take notes after these interviews? Do we have any indication in the record of- I'm assuming some frequency of contact because he has access to talking to these people on a regular basis, whatever regular means. I don't know whether it's daily or weekly, but sometime during the 30- or 90-day period. Does the record speak in any way to notes taken, even if they don't produce some kind of fulsome report to the inmate? Yes, Your Honor. I believe it's Ms. Gilmore's affidavit on summary judgment talks about how a report is generated and those notes are taken. There's also reference in the record, I think it was Mr. Snyder testified, that the staff takes notes when Mr. Esby acts up and puts it in an internal case management system, and that's something that they referenced during the 30- and the 90-day reviews. But he has no opportunity to present his view of whatever these act-up incidents are, right? I mean, they can put in anything they want. I guess he could dispute them at the 90-day if he gets it, but for the purposes of the 30-day. Or he could even say, you know, I had a bad headache that day. He claims he has these migraines, I know. So just additional context sometimes can make an incident seem different. I don't know how that would make it seem different. Sure, I mean, if he speaks rudely to somebody and they think he's just being obstreperous, that's one thing. If he says, you know, I was actually really feeling sick that day, I had a bad headache, yes, I may have spoken sharply, but certainly didn't mean anything by it. But, Your Honor, it's his inability to control his anger that has led to extreme violent outbursts in the past that concerns DOC. Well, killing the dog in 1990 was a terrible thing to do. Well, he also stabbed a couple of officers. Right, through the helmet, I understand. It was a violent incident, but it was in 1990. It was, but as this court noted in Isby v. Clark, a month later he stabbed another inmate in the chest with an ice pick, or an ice pick-like weapon. And Mr. Isby is one of our frequent filers. Don't worry, we know that. And I think the conduct report has shown his, he has a short fuse, and when that fuse is lit, it results in extreme violence. And these outbursts, he may want to give context to them. And I am confident he would try. Nothing is ever Mr. Isby's fault. He, in his testimony- The best evidence of that is that after a full trial, the judge came to the same conclusion, that there wasn't really an alternative, a feasible alternative for him. Yes, I think that is exactly the best evidence. So in some ways- Well, that was the Eighth Amendment issue. Well, but it's still, I'm saying in some ways it suggests that there really, he is continuing to be under this confinement because of his own behavior, and that's a factual finding. Yes, I think that's a- Is that a factual finding from the Eighth Amendment? I thought the Eighth Amendment bench trial, but you, please correct me if I'm wrong, was about the conditions of his confinement. And the judge concludes that none of the things he's complaining about, the food, the laundry, the temperature in the cells, whatever else he's complaining about, none of those violated his Eighth Amendment rights. I didn't think that there were findings of fact. I thought the rest of this was summary judgment where we were taking the facts in the light most favorable to him. As far as the programs? Well, as far as the due process. As far as whether there are alternatives to keeping him in solitary. As far as alternatives, that is under the Eighth Amendment. I think that's the district judge's finding. The test was feasible alternatives. Yes, it's under the, I think, Walker v. Shansky decision pointed out that when you're investigating or examining long-term segregation, you take into account feasible alternatives. And Judge Magnus Stinson said, I do find there is a feasible alternative here. It's the New Castle Transition Unit. But he has steadfastly refused to participate in any programs including that one. And Judge Stinson, I think, also found as a fact that the DOC's concerns about Mr. Isby's dangerousness, if he were to be dropped in the middle of general population without any sort of transition, aren't unreasonable in light of his history. Now, I will say that on the due process issue, that the relief Mr. Isby seeks, and granted, I think that if the court were to disagree with the district court on the summary judgment issue, it would have to be remanded to look into the 90-day. I think that's generally conceded by both sides, that there would have to be a remand to look into the 90-day option, which might fix the problem right there. Right. But I also think Mr. Isby raised the prospect in his brief that qualified immunity wouldn't apply. But the 30-day reviews were approved in Shettle. Smith doesn't say anything about requiring any particular sort of written statement. But that wouldn't prevent a remand for potential injunctive relief. Precisely. It wouldn't prevent a remand for potential injunctive relief. But on the injunctive relief, Mr. Isby is also seeking release directly in the general population, and I think that wouldn't be properly tailored relief. I think the relief would be an injunction. It wouldn't be for us to decide. It would be an argument for another day. Yes, admittedly. I'll move on. I'll say we're not surprised to hear you say that, but it's an argument for another day. There's been arguments in Mr. Isby's brief, and the Fourth Circuit and the Tenth Circuit sort of jump from the premise that process sort of crescendos the longer an offender is in segregation. Doesn't that make sense, given the psychological impact of prolonged deprivation of human contact? I don't know that that does make sense. For this reason, these sorts of decisions are made under the Greenholz-Hewitt sort of analysis. Greenholz is about discretionary parole release, and I don't know of any case law from the Supreme Court or this court or any circuit courts that say, you know, the fourth time you go up for discretionary parole release, you get greater process than the first time you go up for discretionary parole release. Well, the Supreme Court did say that if it's indefinite period of time of isolation, there is a magnified need for meaningful review in Wilkinson. Yes, in Wilkinson, and I guess our position is that this is meaningful review, but Wilkinson also doesn't say. By this, you mean the 30-day process? The 30-day, yes. Our position is the 30-day, there's not a written statement that says anything other than the boilerplate. That's not disputed for the 30-day. So it's completely uninformative from his point of view. They may know what they're thinking, but he doesn't. And in fairness, they may well be telling him independently, but at some point don't we have an obligation to know what's happening? I mean, do we need a more robust record to determine whether this is really meaningful review? Yeah, potentially. I still think that the makeup of the review team, perhaps thinking abstractly, could have been better. But in the Matthews v. Eldridge calculus, you're also having to consider the utility of the additional procedures. And here, what's the utility of a written statement? As Judge Flom pointed out earlier, if we gave a written statement that said, you're still here because you're still a danger, may I finish my sentence? Please do, yes. We'd be back here arguing the same thing. You say, I'm getting the same thing every month. It's not meaningful. And so I don't think that that necessarily leads to a decision to reverse the district judge. We ask that you dismiss the appeal because of the three strikes rule or affirm the judgment. Thank you. All right. Thank you, Mr. Craft. Anything further, Mr. Baba? Just a few brief points, Your Honor. Sure. Your Honor, from 2009 to 2014, Mr. Isby had no incidents. And then the 2014 incident is described in the brief. The state now says, because he has not participated in these programs, it's an absolute bar to him being released from solitary confinement. They say that through litigation. If, in fact, they had conducted a process and said not to Mr. Isby but to another inmate, you've been in solitary for five years. There have been no incidents. But nonetheless, because you're not participating in these two programs, we're not going to release you. That inmate would have the opportunity to challenge that explanation. What I think the state is, in essence, doing here is inoculating its reason by not giving Mr. Isby any reason. And when you say a challenged opportunity, you just mean that he should have a right to request a 90-day review that has meaning. Exactly, Your Honor. But I don't think the state – may I finish my sentence? Please do. I don't think the state can hide behind a boilerplate, not specific explanation, which gives an inmate no ability to challenge it, and then, through litigation, come up with reasons why he cannot be released. I think informal due process requires more. And for that reason, we would ask the court to reverse the judgment, the summary judgment, and we'll stand on our briefs on the Eighth Amendment and the qualified immunity issues. Thank you. All right. Thank you very much. And you were appointed as well, were you not, Mr. Babak? We were. We appreciate very much your help to the court and to your client. Thank you as well to the state. The case is taken under advisement.